**[This opinion has been published in *Ohio Official Reports* at 79 Ohio St.3d 93.]**

CUYAHOGA COUNTY BAR ASSOCIATION *v*. BOYCHUK.

[Cite as *Cuyahoga Cty. Bar Assn. v. Boychuk*, 1997-Ohio-403.]

*Attorneys at law—Misconduct—Two-year suspension—Misappropriation of client funds and neglect of client interests.*

(No. 96-2808—Submitted March 19, 1997—Decided June 25, 1997.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 96-34.

_____

{¶ 1} On April 15, 1996, the relator, Cuyahoga County Bar Association, filed a sixteen-count complaint against respondent, Patricia L. Boychuk of West Palm Beach, Florida, Attorney Registration No. 0055343, charging her with violations of several Disciplinary Rules. On November 22, 1996, a panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board") received the parties' stipulation and heard additional evidence in mitigation.

{¶ 2} The panel found that during respondent's practice of law in Parma, Ohio, from November 1991 through January 1994, she received legal fees for work that was not done and those fees were not refunded.

{¶ 3} In March 1992, while corporate counsel for Wright Mortgage Company ("Wright"), respondent represented Sandra Harris and Harriet Howard, who were attempting to refinance their home through Wright in order to pay a mortgage arrearage to TransOhio Bank, which was threatening foreclosure. When TransOhio refused the attempted payment, respondent advised Harris and Howard to pay Wright $1,875, and Wright would make a payment to stay the foreclosure. However, TransOhio also rejected Wright's attempted payment. Howard and Harris then retained respondent to file a Chapter 13 bankruptcy petition. After

Harris and Howard agreed to a mortgage repayment program in the Chapter 13 case, they were unable to contact respondent. Eventually TransOhio obtained relief from the bankruptcy stay and foreclosed on the property.

{¶ 4} In February 1993, respondent advised John Lisko, who had credit problems, to file a Chapter 13 bankruptcy petition as the best way to implement the purchase of a house. Lisko paid respondent a $150 retainer and agreed that the $1,000 balance of her fee was to be paid through the Chapter 13 plan. When Lisko found that the purchase of a house would require bankruptcy court approval, he attempted to contact respondent, but her telephone was disconnected. Lisko was required to hire a new counsel at a cost of $950 to complete the bankruptcy case and correct respondent's errors.

{¶ 5} Brian Hatala retained respondent in April 1993 and paid her $175 of a total $550 fee for the filing of a Chapter 7 bankruptcy petition. When Hatala was unable to confer with respondent, he asked her staff for a refund of the money he had paid. The refund was refused. Shortly thereafter respondent discontinued her practice of law and closed her office. Also in April 1993, respondent filed a Chapter 13 bankruptcy petition for Robert Shook. Shook discovered an error in the list of creditors filed by respondent, and when respondent filed a second list of creditors Shook found additional errors. When Shook attempted to contact respondent, he found that her offices were closed and her phone disconnected.

{¶ 6} In May 1993, Joseph Buza retained respondent for a fee of $350 to represent him in filing a Chapter 13 bankruptcy petition. Respondent filed the case, and Buza gave respondent $530 to be deposited with the Chapter 13 trustee as his first payment under the Chapter 13 plan. Buza discovered that the money was never deposited, and his attempts to contact respondent were unsuccessful. Although Buza had not agreed to pay additional legal fees, respondent, alleging that she had not been paid any retainer, falsely filed a claim for $1,000 in unpaid fees and received that amount from the Chapter 13 case.

**{¶ 7}** In December 1993, Anthony and Constance Guyton retained respondent and gave her $4,000 for the sole purpose of bringing their home mortgage out of default. Respondent failed to use the funds for that purpose and failed to return the funds. As a result, the Guytons retained another attorney and filed a bankruptcy case. Also in 1993, Harvey Isom retained respondent and gave her $1,000 to be used exclusively to bring his home mortgage payments up to date. Respondent did not use the funds as instructed and did not return the money.

**{¶ 8}** The panel concluded that respondent's actions violated DR 1-102(A)(6) (conduct adversely reflecting on her fitness to practice law), 2-110(A)(2) and (3) (failure to properly withdraw from representation or to return unearned funds of clients), 6-101(A)(3) (neglect of entrusted legal matters), 7-101(A)(2) (failure to carry out contracts of employment), and, with respect to the Harris and Howard matter, 5-105 (improperly accepting employment where her independent judgment is likely to be affected by the representation of another client).

**{¶ 9}** The panel also made findings with respect to several additional charges against respondent that arose when a nonlawyer, Ron Dudas, took over her practice. Dudas was respondent's fiancé. In February 1994, Regina and Scott Netherly, paying a retainer of $200, retained respondent's law office to help them consolidate their debts. The Netherlys did not deal with respondent but instead dealt with Dudas, whom they believed to be an attorney. Dudas told the Netherlys not to pay any further debts and that he would file a Chapter 13 bankruptcy petition for them. For several months creditors repeatedly contacted the Netherlys, who referred them to respondent's office. Dudas or others at respondent's office continually gave the Netherlys excuses as to why the case had not proceeded further. Finally, the Netherlys were unable to contact respondent or anyone at respondent's office.

**{¶ 10}** In November 1991, Phoebe and Elliott Jones responded to a newspaper advertisement by Crown Mortgage Company, which represented that

Crown could save a debtor from losing his home in a mortgage foreclosure. The Joneses paid $1,000 jointly to Dudas, the president of Crown, and to respondent, who had offices in the same suite, to file a Chapter 7 bankruptcy petition for them and pay some part of their mortgage arrearage. After the next meeting with Dudas and the respondent, the Joneses were unable to contact respondent or Dudas, both of whom had moved out of their offices. The Joneses eventually lost their home in a foreclosure action.

{¶ 11} In May 1993, after an initial interview with Dudas, who portrayed himself as a lawyer, Darlene Sanders retained respondent's firm to represent her in a pending Chapter 13 bankruptcy case. Sanders gave checks payable to respondent's firm for $250 in legal fees and for $1,200 to be applied on her mortgage. After she and Dudas made an appointment to meet with her mortgage company, Sanders gave Dudas a check for $2,759 payable to respondent's firm which Dudas said would resolve the bankruptcy proceeding. When Sanders returned for her next appointment with Dudas, respondent's office was closed. She later learned that her checks had been cashed.

{¶ 12} In August 1993, after she retained respondent to represent her in filing a Chapter 7 bankruptcy petition, Shirley Schroeder met with Dudas and paid respondent $1,000 for attorney fees and court costs. The case was filed, but respondent failed to appear at any hearings and Schroeder was required to employ another attorney. Also in August 1993, Klaudine Krug paid respondent a $350 retainer and agreed that respondent would receive the remaining $1,000 of her fee from a Chapter 13 plan that respondent would file for Krug. Dudas told Krug he would file a motion with respect to her maternity leave with the court, but failed to do so. When Krug attempted to contact respondent, she found that the office was closed and the telephone disconnected. Again in August 1993, Tony Bess retained respondent for representation in a Chapter 13 bankruptcy case. Dudas handled the matter. When the case was dismissed in February 1994, the court issued a refund

check for $2,525.27 that was to be used to pay one of Bess's primary creditors. Dudas instructed Bess to endorse the check, which he said would be forwarded to the creditor. However, the creditor never received payment and when Bess attempted to contact Dudas, he found that respondent's office was closed and the telephone disconnected.

{¶ 13} In September 1993, respondent received $500 from James Danelishen to file a Chapter 7 bankruptcy petition. Danelishen was counseled by Dudas and later discovered that, without his knowledge or consent, respondent's office had entered into a reaffirmation agreement with one of his creditors. Danelishen was unsuccessful in his attempts to contact respondent and was required to engage another attorney.

{¶ 14} Respondent admitted to not supervising her office properly, and the panel concluded that with respect to these matters she violated DR 1-102(A)(6), 2-110(A)(2) and (3), 6-101(A)(3), 7-101(A)(2), and, with respect to the Joneses' matter, 5-105.

{¶ 15} The panel found in mitigation that respondent, an alcoholic, began drinking in high school and became addicted to cocaine in 1984. Dudas supplied cocaine to her and, as a result of Dudas's treatment of her, she became a battered woman. Beginning in 1992, Dudas took care of her office without respondent's being aware of what was happening.

{¶ 16} After her arrest in Cuyahoga County in November 1994 for assaulting an officer and carrying a concealed weapon and her subsequent release on three years' probation, respondent began treatment in Minnesota in January 1995 for alcohol and cocaine dependence. She was also diagnosed as suffering from "battered woman's syndrome" as a result of her relationship with Dudas. Respondent completed the treatment and worked as a law clerk in Minnesota. While in Minnesota, respondent filed a Chapter 13 bankruptcy petition, and on February 22, 1996, her Chapter 13 plan was confirmed by the court. In April 1996,

just prior to her move to Florida, respondent contacted the Ohio Lawyers Assistance Program ("OLAP"), which directed her to Florida Lawyers Assistance, Inc. ("FLA"). She entered into a contract with FLA in May 1996. The director of OLAP, who has monitored respondent's progress, wrote that respondent "is on a strong sure path to recovery from substance abuse." FLA reported that "her compliance with [the] * * * terms of the contract have been excellent."

{¶ 17} Some of the claims against respondent are being paid in her Chapter 13 case. Seven claims, totaling $16,152.63, were pending against respondent in the Clients' Security Fund on September 24, 1996, and money is being directed there as well. Some of respondent's restitution payments are being made by her parents. Dudas was imprisoned for theft of funds from respondent's clients.

{¶ 18} The panel recommended that respondent be suspended from the practice of law for two years. It further recommended that attorney monitors in both Ohio and Florida submit to the Supreme Court of Ohio on December 31 of each of the two years following suspension, reports of a sponsor, and reports relating to random urine tests as approved by OLAP, restitution, completion of the probation conditions in Cuyahoga County, completion of the Chapter 13 bankruptcy plan, resolution of all monetary claims against respondent, regular attendance at Alcoholics Anonymous meetings, and total abstinence from all mind-altering drugs, including alcohol. The board adopted the findings and conclusions of the panel, but recommended only that respondent be suspended from the practice of law for two years.

_____

*Blaise C. Guisto*, *Saul Eisen* and *Gregory F. Clifford*, for relator.

*Charles W. Kettlewell*, for respondent.

_____

***Per Curiam.***

{¶ 19} We have said on many occasions that the misappropriation of client funds and the neglect of client interests normally warrant the severe sanction of disbarment. *Columbus Bar Assn. v. Sterner* (1996), 77 Ohio St.3d 164, 167, 672 N.E.2d 633, 635, and cases cited therein. However, in imposing a sanction, we consider not only the duty violated, but also the lawyer's mental state, the actual injury caused, and whether mitigating factors exist. In this case, we note respondent's personal and emotional problems that existed at the time of these infractions and the steps respondent has since taken to recover from her involvement with alcohol and drugs. We also note that respondent began a timely, good-faith effort to make restitution before disciplinary proceedings were commenced. Therefore, we agree with the board's recommendation and order that respondent be suspended from the practice of law for two years. Costs taxed to respondent.

*Judgment accordingly.*

DOUGLAS, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

———————————

**LUNDBERG STRATTON, J., dissenting.**

{¶ 20} I would suspend the respondent indefinitely. The lengthy course of her disciplinary violation, her criminal convictions, and her abuse of cocaine deserve a longer suspension and proof of long-term rehabilitation before readmittance to the bar is merited. Therefore, I respectfully dissent.

MOYER, C.J., and COOK, J., concur in the foregoing dissenting opinion.

———————————